[Cite as *State v. Angers*, 2021-Ohio-3640.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
AUGLAIZE COUNTY

STATE OF OHIO,

            CASE NO. 2-21-04

  PLAINTIFF-APPELLEE,

  v.

BRIAN D. ANGERS,         O P I N I O N

  DEFENDANT-APPELLANT.

Appeal from Auglaize County Municipal Court
Trial Court No. 2020-TRC-1615

Judgment Reversed, Cause Remanded

Date of Decision:  October 12, 2021

APPEARANCES:

 *Nick A. Catania* for Appellant

 *Joshua A. Muhlenkamp* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Brian D. Angers ("Angers") appeals the judgment of the Auglaize County Municipal Court, alleging that there was not a legal basis for the traffic stop of his vehicle or the resulting investigation into whether he was operating a vehicle under the influence. For the reasons set forth below, the judgment of the trial court is reversed.

*Facts and Procedural History*

{¶2} On May 2, 2020, Jaime Wick ("Wick") was working an overnight shift in a gas station store in St. Marys, Ohio. Tr. 10. A man, who was later identified as Angers, parked a "grayish blue" car at a pump at the station and walked into the store. Tr. 4, 18-19. Wick testified that Angers was "staggering and wobbly" as he walked into the store at the station. Tr. 17. Angers approached the counter and asked her for directions, telling her that he was lost and trying to reach Findlay, Ohio. Tr. 12. Wick stated that she "smelled alcohol" on him. Tr. 16.

{¶3} Wick testified that she called the police when Angers went into the bathroom. Tr. 13. Laura Fischbach ("Fischbach"), a dispatcher for the city of St. Marys, received this call from Wick at 6:39 A.M. Tr. 5. While Wick was on the phone, Angers walked out of the bathroom. Tr. 13. She testified that, when Angers saw her on the phone, he walked out of the store fast and got in his car. Tr. 13-14. Wick did not believe that Angers ever pumped gas while he was at the station. Tr.

18. Wick stated that she observed Angers pull out of the gas station parking lot, drive on the wrong side of the road, and then drive through a red light. Tr. 14.

{¶4} Fischbach obtained Angers's license plate number and the color of his vehicle from Wick. Tr. 4. She also found out from Wick that Angers was driving eastbound on State Route 33. Tr. 4. Fischbach then relayed this information to Sergeant Thomas Kennedy ("Sergeant Kennedy") of the St. Marys Police Department. Tr. 26, 28. Sergeant Kennedy testified that "at that point in the morning * * * and that whole time period there wasn't a lot of traffic * * * due to the whole pandemic shutdown * * *." Tr. 28. He then said, "I only saw one vehicle heading eastbound on 33. I was able to catch up to that vehicle verify that it was the same license plate * * * and conducted a traffic stop with it on the overpass." Tr. 28.

{¶5} Sergeant Kennedy then got out of his police car and approached Angers's vehicle. Tr. 29. Around this time, Patrolman Scott Buschur ("Patrolman Buschar") arrived at the scene in his patrol car. Ex. 1. Sergeant Kennedy testified about his initial interaction with Angers as follows:

> **As I spoke with him it was really hard to really s[m]ell anything as far as alcohol or anything. The[re] was a very strong odor of Cigarette smoke coming from the vehicle um—well it just kinda smelled dirty almost of urine or something like that um—I asked Mr. Angers if he had anything to drink um—and he stated he didn't um—it was hard to observe his eyes also because of his glasses and a the[y're] thick and I believe they were kinda dirty at the time so it was very hard to see if * * * his eyes were blood shot or not. * * * [T]he wind up on the overpass made it hard to**

> **s[m]ell anything * * * so at that point I got his drivers license from him, returned to my patrol car, ran his information * * *.  I asked Patrolman Buschur to go up and speak with him * * * to see if he was able to smell anything.**

Tr. 29.  Sergeant Kennedy then returned to the vehicle and "asked Mr. Angers to step out of the vehicle" and "asked him to perform several standardized field sobriety test[s] which he agreed to do."  Tr. 30.

{¶6}  Sergeant Kennedy then asked Angers to take off his glasses to perform the Horizontal Gaze Nystagmus Test ("HGN Test").  Tr. 31.  He testified that, "[o]nce he [Angers] took his glasses off I did observe that his eyes were red, watery, and bloodshot."  Tr. 31.  At this point, he also "detect[ed] an odor of * * * an alcoholic beverage coming from" Angers.  Tr. 34.  Sergeant Kennedy testified that he observed "[s]ix out of six" clues as he administered the HGN Test.  Tr. 32.  After the field sobriety tests, Sergeant Kennedy concluded that Angers was impaired and informed Angers that he was under arrest.  Tr. 34.  Angers then admitted "that he had drank the night before * * *."  Tr. 34.

{¶7}  On May 4, 2020, a complaint was filed that alleged Angers had been operating a vehicle under the influence of alcohol or drugs in violation of R.C. 4511.19(A)(1)(a).  Doc. 1.  Angers then entered a plea of not guilty to this charge.  Doc. 10.  On September 30, 2020, he filed a motion to suppress that argued the police did not have a legal basis to conduct a traffic stop of his vehicle or detain him for field sobriety tests thereafter.  Doc. 34.

{¶8} On November 12, 2020, the trial court held a suppression hearing. Doc. 110. The prosecution called Fischbach, Wick, Sergeant Kennedy, and Patrolman Buschur to testify. Tr. 2, 8, 26, 50. Video footage from the body cameras worn by Sergeant Kennedy and Patrolman Buschur during the traffic stop and field sobriety tests was also admitted into evidence. Ex. 1. On December 10, 2020, the trial court issued an entry that denied the motion to suppress. Doc. 60.

{¶9} On April 9, 2020, Angers appeared before the trial court and changed his plea to no contest. Doc. 86. After accepting Angers's plea and finding him guilty, the trial court proceeding to sentencing. Doc. 86. Angers filed his notice of appeal on April 13, 2021. Doc. 93. On appeal, he raises the following two assignments of error:

**First Assignment of Error**

**The trial court abused its discretion in admitting the evidence obtained after the traffic stop because there was not reasonable suspicion for a 'Terry Stop' of the defendant's vehicle.**

**Second Assignment of Error**

**The trial court abused its discretion in admitting evidence obtained after the officer expanded the scope of the stop from a 'Terry Stop' to an OVI Investigation without reasonable suspicion to do so.**

*First Assignment of Error*

{¶10} Angers argues that the police officer did not have a reasonable, articulable suspicion to stop his vehicle.

Legal Standard

**{¶11}** The Fourth Amendment to the United States Constitution protects citizens "against unreasonable searches and seizures * * *." Fourth Amendment, United States Constitution. The Ohio Constitution offers a parallel provision to the Fourth Amendment of the Federal Constitution that has been held to afford the same level of protection as the United States Constitution. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 1997-Ohio-343, 685 N.E.2d 762 (1997).

**{¶12}** "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), citing *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, "[t]he touchstone of the Fourth Amendment is reasonableness." *Jimeno* at 250. "[A] police stop of a motor vehicle and the resulting detention of its occupants has been held to be a seizure under the Fourth Amendment." *State v. Kerr*, 3d Dist. Allen No. 1-17-01, 2017-Ohio-8516, ¶ 13, citing *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

**{¶13}** "In order to initiate a constitutionally permissible traffic stop, law enforcement must, at a minimum, have a reasonable, articulable suspicion to believe that a crime has been committed or is being committed." *State v. Smith*, 2018-Ohio-

1444, 110 N.E.3d 944, ¶ 8 (3d Dist.), citing *State v. Andrews*, 57 Ohio St.3d 86, 565

N.E.2d 1271 (1991).

> **"The Supreme Court of Ohio has defined 'reasonable articulable suspicion' as 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion [upon an individual's freedom of movement].'"** *State v. Shaffer*, **2013-Ohio-3581, 4 N.E.3d 400, ¶ 18 (3d Dist.), quoting** *State v. Bobo*, **37 Ohio St.3d 177, 178, 524 N.E.2d 489 (1988), quoting** *Terry v. Ohio*, **392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause."** *Kerr, supra*, **at ¶ 15, quoting** *State v. Jones*, **70 Ohio App.3d 554, 556-557, 591 N.E.2d 810 (2d Dist. 1990).**

(Bracketed Text Sic.) *Smith* at ¶ 9. "Furthermore, these circumstances are to be

viewed through the eyes of the reasonable and prudent police officer on the scene

who must react to events as they unfold." *Andrews* at 88-89. "A court reviewing

the officer's actions must give due weight to his experience and training and view

the evidence as it would be understood by those in law enforcement." *Id*. at 88.

{¶14} While courts generally examine the knowledge of the police officer at

the time of the traffic stop, "different considerations apply" in circumstances where

"an investigative stop is made in sole reliance upon a police dispatch * * *."

*Maumee v. Weisner*, 87 Ohio St.3d 295, 297, 1999-Ohio-68, 720 N.E.2d 507 (1999).

> **A police officer need not always have knowledge of the specific facts justifying a stop and may rely, therefore, upon a police dispatch or flyer.** *United States v. Hensley* **(1985), 469 U.S. 221, 231, 105 S.Ct. 675, 681, 83 L.Ed.2d 604, 613. * * * When a dispatch is involved, therefore, the stopping officer will typically**

**have very little knowledge of the facts that prompted his fellow officer to issue the dispatch. The United States Supreme Court has reasoned, then, that the admissibility of the evidence uncovered during such a stop does not rest upon whether the officers relying upon a dispatch or flyer 'were themselves aware of the specific facts which led their colleagues to seek their assistance.' [(Emphasis sic.) *Id*.] It turns instead upon 'whether the officers who issued the flyer' or dispatch possessed reasonable suspicion to make the stop. *Id*. at 231[.]**

(Citations omitted.) *Weisner* at 297. "[W]here an officer making an investigative stop *relies solely upon a dispatch*, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." (Emphasis sic.) *Id*. at 298.

{¶15} In turn, when the dispatcher's information comes exclusively from an informant's tip, courts must examine that tip to determine its "weight and reliability * * *." *Weisner, supra*, at 299.

**In attempting to ascertain whether information provided by an informant's tip bore some indicia of reliability that established reasonable suspicion for an investigatory stop, many courts, including this court, have found it useful to place the informant into one of three categories: (1) anonymous informant, (2) known informant (someone from the criminal world who has provided previous reliable tips), and (3) identified citizen informant. *Maumee v. Weisner*, 87 Ohio St.3d 295, 300, 720 N.E.2d 507 (1999); *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶ 36, *overruled on other grounds*, *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, 159 N.E.3d 248.**

**\* \* \***

**[W]hen 'the information possessed by the police before the stop stems solely from an informant's tip, the determination of reasonable suspicion will be limited to an examination of the**

**weight and reliability due that tip.' [*Weisner*] at 299, 720 N.E.2d 507. 'The appropriate analysis, then, is whether the tip itself has sufficient indicia of reliability to justify the investigative stop.' *Id*. Acknowledging the three recognized categories of informants, we noted that an anonymous informant was comparatively unreliable and would consequently require independent police corroboration in order to demonstrate some indicia of reliability. *Id*. at 300, 720 N.E.2d 507. By contrast, we determined that an identified citizen informant may be highly reliable and, therefore, a strong showing as to other indicia of reliability may be unnecessary. *Id*.**

*State v. Tidwell*, --- Ohio St.3d ---, 2021-Ohio-2072, --- N.E.3d ---, ¶ 29, 31.

**As to the informant's basis of knowledge, the courts consider 'personal observation' to be more reliable than 'a secondhand description.' [*Weisner*] at 302. Other elements that add credibility are 'immediacy' of the citizen's call, 'as it avoids reliance upon the informant's memory,' and the informant's motivation. *Id*. It is important to remember, however, that all these factors are reviewed together under the totality of the circumstances and therefore, we do not review each articulated reason for the stop in isolation. *Id*.; *see State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282 (2007), paragraph two of the syllabus.**

*State v. Hancock*, 3d Dist. Auglaize No. 2-15-17, 2016-Ohio-2671, ¶ 10.

**{¶16}** "To deter Fourth Amendment violations, the Supreme Court of the United States has adopted an exclusionary rule under which 'any evidence that is obtained during an unlawful search or seizure will be excluded from being used against the defendant.'" *Kerr, supra*, at ¶ 17, quoting *State v. Steinbrunner*, 3d Dist. Auglaize No. 2-11-27, 2012-Ohio-2358, ¶ 12. Thus, the appropriate remedy for a Fourth Amendment violation is generally the suppression of any illegally obtained

evidence. *State v. Harpel*, 3d Dist. Hardin No. 6-20-03, 2020-Ohio-4513, ¶ 16, quoting *State v. O'Neal*, 3d Dist. Allen No. 1-07-33, 2008-Ohio-512, ¶ 19.

{¶17} "Appellate review of a decision on a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

> **At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. [*Burnside* at ¶ 8].** ***See also State v. Carter*, 72 Ohio St.3d 545, 552[, 651 N.E.2d 965] (1995). When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence.** *Burnside* **at ¶ 8, citing** *State v. Fanning*, **1 Ohio St.3d 19[, 437 N.E.2d 583] (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo; therefore, we must decide whether the facts satisfy the applicable legal standard. [*Burnside* at ¶ 8], citing** *State v. McNamara*, **124 Ohio App.3d 706, 710[, 707 N.E.2d 539] (4th Dist. 1997).**

(Brackets sic.) *Harpel* at ¶ 16, quoting *State v. Sidney*, 3d Dist. Allen No. 1-19-32, 2019-Ohio-5169, ¶ 8.

Legal Analysis

{¶18} In this case, the police relied on the tip they received through dispatch as the basis for initiating a traffic stop of Angers's vehicle. Tr. 40. For this reason, we must examine the "weight and reliability due th[is] tip." *Weisner, supra*, at 299. At the suppression hearing, Wick, Fischbach, Sergeant Kennedy, Patrolman Buschur, and Angers testified. Tr. 2, 8, 26, 50, 57. The prosecution also introduced a recording of the call between Wick and Fischbach. Ex. 1. We will examine this

evidence to determine whether the State "demonstrate[d] * * * that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." *Weisner, supra*, at 297.

{¶19} At the time that Wick gave her tip over the phone, she provided her name to the dispatcher. Ex. 1. She also gave the name and location of the business where she worked and from which she was making this call. Ex. 1. *See State v. Hines*, 11th Dist. Lake No. 2004-L-066, 2005-Ohio-4208, ¶ 17 (considering the fact that a citizen informant "left her name and telephone number with the police dispatcher" to be an indicator of reliability). As such, Wick was an "identified citizen informant." *Tidwell, supra*, at ¶ 29.

{¶20} Wick also relayed information about her personal observations of Angers's condition. *See State v. Loop*, 4th Dist. Scioto No. 93CA2153, 1994 WL 88041, *3 (Mar. 14, 1994), quoting *State v. Carstensen*, 2d Dist. Miami No. 91-CA-13, 1991 WL 270665, *2 (Dec. 18, 1991) ("Information from an ordinary citizen who has personally observed what appears to be criminal conduct carries with it indicia of reliability and is presumed to be reliable."). She told the dispatcher that Angers could "barely stand up" in the gas station store and appeared to be "really drunk." Ex. 1. Tr. 16-17. She stated that Angers told her that "he[ had] been driving around for the last four hours, lost, trying to get to Findlay." Ex. 1. Tr. 16-17.

{¶21} Wick also described a situation that was occurring contemporaneously to her phone call with the dispatcher. *See State v. Rutherford*,

2d Dist. Montgomery No. 28486, 2020-Ohio-1309, ¶ 18 (finding the fact that a citizen informant "called contemporaneously as the incident happened" to be a factor that supported the tip's reliability). While she was on the phone, Wick observed Angers leave the store; get into his car; pull onto the roadway; drive on the wrong side of the road; and drive through a red light. Ex. 1. Tr. 14, 25. *See State v. Borum*, 9th Dist. Summit No. 27167, 2014-Ohio-5639, ¶ 8 ("The immediacy of the report lends further credibility to the tip, as the informant's account is not completely dependent on memory.").

{¶22} Wick was still able to see Angers's vehicle from her vantage point in the gas station store as the police car pulled behind Angers's vehicle. Tr. 23. Ex. 1. On the phone, Wick informed the dispatcher that the police car was behind Angers's vehicle. Ex. 1. The dispatcher relayed this information to Sergeant Kennedy. Ex. 1. Wick was able to see the police initiate a traffic stop of Angers's vehicle while she was still on the phone with the dispatcher. Ex. 1.

{¶23} Further, Wick accurately described the color of Angers's car; the road on which Angers was traveling; the direction that he was traveling; and his license plate number. Ex. 1. *See State v. Boiani*, 8th Dist. Cuyahoga No. 98314, 2013-Ohio-1342, ¶ 34 (considering the facts that the identified citizen informant "provided accurate information about [the defendant's] * * * vehicle and location as well as accurate identification of himself [the citizen informant]"). The police were able to identify Angers's vehicle on the basis of this information. Tr. 28, 39.

{¶24} Having examined the facts of this case under the totality of the circumstances, we conclude that the tip from the identified citizen informant had sufficient indicia of reliability to serve as a legal basis for an investigative traffic stop of Angers's vehicle. Since this tip provided the police with a reasonable, articulable suspicion that Angers was engaged in criminal activity, the trial court did not err in concluding that the initial traffic stop was legally justified. Accordingly, Angers's first assignment of error is overruled.

*Second Assignment of Error*

{¶25} Angers argues that the police officer did not have a legal basis to expand the scope of this traffic stop to include field sobriety tests.

Legal Standard

{¶26} "[T]here are three distinct stages in the typical * * * [OVI] scenario: (1) the initial stop; (2) the request that the driver submit to field sobriety tests; and (3) the arrest." *State v. Dierkes*, 11th Dist. Portage No. 2008-P-0085, 2009-Ohio-2530, ¶ 18, quoting *State v. Richards*, 11th Dist. Portage No. 98-P-0069, 1999 WL 1580980, *2 (Oct. 15, 1999). "In order to warrant removing a person from his vehicle to conduct field sobriety tests, a police officer must have reasonable articulable suspicion to believe that the person was driving under the influence of drugs or alcohol." *State v. Swartz*, 2d Dist. Miami No. 2008 CA 31, 2009-Ohio-902, ¶ 11, quoting *State v. Knox*, 2d Dist. Greene App. No. 2005-CA-74, 2006-Ohio-3039, ¶ 11.

**{¶27}** "Whether an officer had a reasonable, articulable suspicion to administer field sobriety tests is a 'very fact-intensive' determination." *State v. Santiago*, 195 Ohio App.3d 649, 2011-Ohio-5292, 961 N.E.2d 264, ¶ 13, quoting *State v. Wells*, 2d Dist. Montgomery No. 20798, 2005-Ohio-5008, ¶ 9. In deciding whether a police officer has a sufficient legal justification to administer field sobriety tests, courts have considered the following factors:

> **(1) the time and day of the stop (Friday or Saturday night as opposed to, e.g., Tuesday morning); (2) the location of the stop (e.g., whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer ('very strong,' 'strong,' 'moderate,' 'slight,' etc.); (9) the suspect's demeanor (belligerent, uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given.**

*State v. Schriml*, 3d Dist. Marion No. 9-12-32, 2013-Ohio-2845, ¶ 26, quoting *State v. Evans*, 127 Ohio App.3d 56, 711 N.E.2d 761, fn. 2 (11th Dist. 1998). None of these factors are to be considered "in isolation." *State v. Null*, 3d Dist. Logan No. 8-19-50, 2020-Ohio-3222, ¶ 19. However, courts generally uphold "an officer's

decision to conduct roadside sobriety tests * * * where the officer bases his decision on a number of factors." *Evans* at 63.

Legal Analysis

{¶28} In this case, Wick called dispatch at roughly 6:39 A.M. on a Saturday morning. Tr. 5. The traffic stop occurred shortly thereafter on an overpass down the street from a gas station. Tr. 41. At the suppression hearing, Sergeant Kennedy testified that, before he initiated the traffic stop of Angers's vehicle, he did not see Angers speed, run a red light, or drive on the wrong side of the road. Tr. 40-41. He further testified that Angers promptly pulled over once the lights on the police cruiser had been activated. Tr. 42. Thus, Sergeant Kennedy's testimony indicates that, by the time that he had effectuated this traffic stop, he had not personally observed any signs that Angers's driving was impaired.

{¶29} At the suppression hearing, the State introduced video footage from Sergeant Kennedy's body camera. Ex. 1. This footage provides a clear view of Angers during his entire interaction with the police and captures the statements that he made to the officers on the scene. Ex. 1. In his testimony, Sergeant Kennedy indicated that Angers did not have slurred speech, slow response times, or noticeably impaired movements as he was answering questions. Tr. 43-44.

{¶30} Our review of this video footage confirms these representations. Ex. 1. In response to several requests from Sergeant Kennedy, Angers can be seen rolling down his window, turning down the volume of his radio, obtaining his

license from his wallet, and answering several questions without any apparent difficulty or noticeable delay. Ex. 1. Further, when asked, Angers denied having had anything to drink. Ex. 1. When Sergeant Kennedy mentioned the tip from someone at the gas station, Angers indicated that he had not acted odd. Ex. 1.

{¶31} After obtaining Angers's driver's license, Sergeant Kennedy approached Patrolman Buschur, who was standing behind Angers's vehicle, and said, "Stick your head in there and see if you smell anything. I don't smell anything. And his eyes don't even look bloodshot." Ex. 1. In response, Patrolman Buschur began walking towards the driver's side window to speak with Angers while Sergeant Kennedy ran Angers's driver's license in his patrol car. Ex. 1.

{¶32} The State introduced the video footage from Patrolman Buschur's body camera at the suppression hearing. Ex. 1. In this footage, Angers can be seen unscrewing the cap of a water bottle, taking a drink from the bottle, and screwing the cap back onto the water bottle without any apparent difficulty. Ex. 1. He further answered several questions from Patrolman Buschur without slurring his speech or manifesting delayed response times. Ex. 1. At no point was Angers belligerent or uncooperative with the police officers. Ex. 1.

{¶33} After speaking with Angers briefly, Patrolman Buschur walked back towards the patrol car to speak with Sergeant Kennedy. Ex. 1. Sergeant Kennedy asked, "Did you smell anything?" Ex. 1. Patrolman Buschur replied, "It smells like vanilla tobacco. It's kind of overwhelming." Ex. 1. When Sergeant Kennedy said,

"I don't smell any alcohol," Patrolman Buschur replied, "I didn't get alcohol either." Ex. 1. Sergeant Kennedy then stated, "I don't know, man." Ex. 1.

{¶34} At this point, Sergeant Kennedy can be seen exiting the police cruiser and walking towards Angers's vehicle. Ex. 1. When he approached the driver's side window, he told Angers to "step out here for me. Come out here to my car real quick." Ex. 1. Sergeant Kennedy then administered several field sobriety tests. Ex. 1. We must now determine whether the police had a reasonable, articulable suspicion of criminal activity at the time that they ordered Angers out of his vehicle to administer field sobriety tests.

{¶35} At the suppression hearing, the testimony of the officers establishes that only one of the eleven factors in *Evans* was present at the time that Angers was ordered out of his vehicle for field sobriety tests. *Evans, supra*, at fn. 2. Besides the "cognizable report that the driver may be intoxicated" from Wick, the police did not testify that they observed any other indicators of intoxication or impairment that would justify expanding the scope of the traffic stop to include field sobriety tests. *Schriml, supra*, at ¶ 27, quoting *Evans, supra*, at fn. 2. Aside from this "cognizable report," the police had no other reason to believe that Angers was engaged in criminal activity at the point that they decided to administer field sobriety tests.

{¶36} A review of the body camera footage indicates that Wick's tip was not corroborated until after the police began to administer field sobriety tests. In fact, the observations made by the police in between pulling behind Angers's vehicle and

-17-

administering the field sobriety tests were arguably incongruent with the tip. By that point, the police had not detected the odor of an alcoholic beverage, witnessed signs of erratic driving, or determined whether Angers's eyes were blood shot. Further, Angers did not exhibit signs of impairment, such as a lack of coordination, slurred speech, or belligerence. Angers also denied having had anything to drink.

{¶37} At the suppression hearing, Sergeant Kennedy was asked what conclusions he had drawn based on his observations up to the point when he decided to expand the scope of the traffic stop to include field sobriety tests. Tr. 30. He replied as follows:

> **Based on the information we were given by the dispatcher, from the employee at Shell, and um-what I observed I thought it was either he wasn't—*even if I didn't suspect * * * he was under the influence of alcohol at that moment. I thought there was [a] possibility that he could be impaired* by some sort of a narcotic or something like that being that I didn't smell anything so I wanted to make sure that he was okay to drive before I sent him on his way to drive an hour to Findlay so I was concerned that he could be under the influence and I wanted to verify that he was or wasn't before I concluded the traffic stop.**

(Emphasis added.) Tr. 30. However, before Angers was ordered out of his vehicle to perform field sobriety tests, the police officers did not ask Angers if he had used drugs or had taken any prescription medications. Ex. 1. Further, the police officers did not testify that they had observed any indicators of drug use, alcohol use, or impairment that would suggest Angers was operating a vehicle while under the influence of alcohol or any other substance. Thus, this statement, in the context of

the other evidence in the record, ultimately communicates that Angers was detained

for field sobriety tests on the mere possibility of criminal activity rather than on the

basis of a reasonable, articulable suspicion of criminal activity.

{¶38} On appeal, the State argues that "three factors justified further

investigation" and provided the police with the reasonable, articulable suspicion that

was necessary to conduct field sobriety tests. Appellee's Brief, 8. These three

factors are:

> **(1) Angers had missed the turn to the entrance ramp onto U.S. 33, which would enable him to get to I-75 North, which would have been the most direct route to his home in Findlay; (2) Angers' nervousness * * * as exhibited in his avoiding eye contact and only providing short answers to questions * * *; (3) the smell of tobacco and urine, which could mask any alcohol odor, and the tobacco could have been used as an attempted countermeasure to the detection of the odor of alcohol.**

Appellee's Brief, 7-8. However, for the following reasons, we conclude that these

factors do not provide a legal justification for expanding the scope of the traffic stop

under the circumstances of this case.

{¶39} The first factor put forward by the State assumes that Angers was

driving towards Findlay and had missed his turn onto the overpass. However, at the

suppression hearing, Sergeant Kennedy affirmed that he did not "know whether

[Angers] * * * was going to turn [on the overpass] to get on the 29 going west or

[intended to] go[] straight towards Van Wert."[1] Tr. 41. A wrong turn is not, by

---

[1] Wick appears to have been aware that Angers was driving towards the Findlay area. Ex. 1. However, the testimony of the police officers gives no indication that they were aware that Angers was trying to reach

itself, an indication of impairment or criminal activity. But in this case, the police did not even have a reason to believe that Angers was headed away from rather than towards his intended destination.

**{¶40}** As to the second factor, Angers did not, based on the video footage or the testimony at the suppression hearing, exhibit indications "of conspicuous or abnormal nervousness, such as 'someone's pulse beating heavily in their neck,' pupil dilation, or out-of-place sweating * * *." *State v. Lawler*, 2020-Ohio-849, 152 N.E.3d 962, ¶ 44 (3d Dist.). From the video footage, Angers's eye contact with the officers did not appear abnormal based upon where the officers were standing in relation to him while he was sitting inside his vehicle. Angers was also not making "furtive glances" or movements as he spoke with the officers. *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶ 27.

**{¶41}** Further, Angers answered the questions asked by the police. Ex. 1. His answers to questions were not "evasive or implausible * * *." *State v. McCrone*, 63 Ohio App.3d 831, 837, 580 N.E.2d 468 (9th Dist. 1989). These answers also were not incoherent or inconsistent with each other. *See State v. Matzinger*, 2017-Ohio-324, 81 N.E.3d 841, ¶ 30 (4th Dist.). He also complied with Sergeant

---

Findlay. Tr. 41. Before he was ordered out of his vehicle, Angers admitted to the police that he had gotten lost during his drive. Ex. 1. However, he never stated that his intended destination was Findlay. Ex. 1. Angers only indicated that he was from the Findlay area. Ex. 1. The police never asked where he was headed before he exited his vehicle for field sobriety tests. Ex. 1. Thus, the police appear to have only been aware that Angers was from the Findlay area. Ex. 1. At the suppression hearing, the State asked Sergeant Kennedy if Angers had passed the exit ramp that would have led him towards Findlay. Tr. 29. However, without knowing where Angers meant to go, this information does not suggest that Angers was headed away from his intended destination.

Kennedy's request to produce his driver's license. *See McCrone* at 837. While the State argues that Angers was giving "short answers" to the questions asked by the police, this was largely due to the nature of the questions that were posed by the officers. Appellee's Brief, 7-8. The types of questions asked by the officers were not likely to elicit answers longer than those given by Angers.

{¶42} Finally, the assertion that Angers was using tobacco as a countermeasure to mask the smell of alcohol is wholly speculative. The evidence in the record does not indicate that Angers was even smoking at the time of the police stop. A general smell of tobacco in his car does not, by itself, support an inference that Angers was attempting to mask the smell of an alcoholic beverage. *See State v. Wardle*, 7th Dist. Mahoning No. 16 MA 0150, 2017-Ohio-9238, ¶ 11. Further, the testimony of the officers did not include observations that would suggest that Angers appeared to be using tobacco as a countermeasure. Thus, the State has not supported this argument with any other facts that would indicate that this tobacco smell was "an attempted countermeasure." Appellee's Brief, 7-8. Thus, under the facts of this case, the three factors identified by the State on appeal do not establish that the police had a reasonable, articulable suspicion to expand the scope of the traffic stop to include field sobriety tests.

{¶43} Given the facts of this case, we conclude that the police did not have the reasonable, articulable suspicion that was necessary to detain Angers for field sobriety tests and that the trial court erred in denying his motion to suppress.

Angers's second assignment of error is, therefore, sustained. Accordingly, his conviction is reversed, and this case is remanded to the trial court for further proceedings that are consistent with this opinion.

*Conclusion*

{¶44} Having found error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Auglaize County Municipal Court is reversed.

*Judgment Reversed*
*And Cause Remanded*

**ZIMMERMAN and MILLER, J.J., concur.**

**/hls**