[Cite as *Solon v. Moore*, 2025-Ohio-2446.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CITY OF SOLON,                               :

    Plaintiff-Appellant,          :

                     No. 114160

v.                                          :

DAWN M. MOORE,                               :

    Defendant-Appellee.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** July 10, 2025

---

Criminal Appeal from the Bedford Municipal Court
Case No. 23TRC06951

---

### *Appearances:*

Lon D. Stolarsky, *for appellant.*

Marein & Bradley, LLC, Steven L. Bradley and Michael I. Marein, *for appellee.*


LISA B. FORBES, P.J.:

{¶ 1}  Appellant, the City of Solon ("the City"), appeals a judgment of the Bedford Municipal Court granting defendant-appellee, Dawn M. Moore's ("Moore") motion to suppress evidence obtained during an OVI investigation. For the reasons that follow, we reverse the trial court's decision.

## I. Facts and Procedural History

{¶ 2}   On December 11, 2023, around 11:00 a.m., Solon Police received a 9-1-1 call from Moore's son, reporting that his mother had left their home and was "drunk driving" to get more alcohol.  Officers found Moore in her vehicle at a nearby Giant Eagle Market District.  After a brief interaction, she was asked to perform field sobriety tests.  Thereafter, she was arrested on suspicion of operating a vehicle while intoxicated ("OVI").  At the station, Moore — already on probation for a prior OVI — refused a breathalyzer and was charged with OVI under R.C. 4511.19(A)(2).[1]

{¶ 3}   Moore filed a motion to suppress, seeking the exclusion of all evidence obtained as a result of her performance of the field sobriety tests.  She asserted that the police lacked the requisite reasonable suspicion to lawfully administer the tests, thereby violating her rights under the Fourth Amendment to the United States Constitution, as well as Ohio Const. art. I, § 14, which protect against unreasonable searches and seizures.  Moore also challenged the manner in which the police conducted the field sobriety tests and argued that, because the tests were not properly administered, Solon police lacked probable cause to arrest her and charge her with OVI.

---

[1] Under R.C. 4511.19(A)(2), a person is prohibited from refusing a chemical test for drugs and alcohol after they have been arrested for OVI if they have been previously convicted of an OVI offense within 20 years.  At the time of her arrest, Moore was subject to probation for an OVI conviction she obtained six months earlier.

**A. Suppression Hearing**

{¶ 4} On May 15, 2024, the trial court held a suppression hearing. Four prosecution witnesses testified: Moore's 17-year-old son who called 9-1-1, and three Solon police officers who had been involved in the OVI investigation.

**1. Moore's Son**

{¶ 5} Moore's son testified that on December 11, 2023, he was living with his mother at their home on SOM Center Road, when he called 9-1-1 to report her to police. The prosecution then played an audio recording of the 9-1-1 call for the court. The most relevant portions of that call are as follows:

Dispatch: 9-1-1. Where is your emergency?

Son: Solon, Ohio.

Dispatch: What is the address?

Son: It's not exactly an address, my mom just left. She's on SOM Center Road. She's drunk driving. I don't know like if there's anything you can do. I just know the car is — .

. . .

Dispatch: What kind of vehicle is she driving?

Son: Cadillac SRX. It's an SUV.

Dispatch: What color?

Son: Silver. There's a dent on the front left.

Dispatch: How long ago did she leave?

Son: Like maybe two to three minutes ago. She just relapsed from like six months of no alcohol but now she's like tripping. I don't even know what to do.

Dispatch: What's your mom's name?

Son:  It's Dawn Moore.

Dispatch:  Do you know which direction she went?

Son:  Um, if . . . I think she turned left out of my driveway.  So, it would be towards the highway, but she is not getting on the highway.  Just like . . . I know she's going to the store for more beer probably.  But I don't think she'll come back here.

Dispatch:  Do you know what store?

Son:  There's a convenience store called D & M.

. . .

Dispatch:  Hang on one second.

Son:  Yeah.  Thank you. I had no one else to call.

[break in conversation]

Dispatch:  Were you two having an altercation or anything like that?

Son:  Um, I came home.  Honestly, I just came home, and I saw she was drunk.  So, I tried to talk to her but she wouldn't listen to me.  So, I dumped the alcohol out.  And that she is probably just going to get some more probably.

Dispatch:  Okay.  Do you know your mom's date of birth?

Son:  Uh, 6/29/79.

. . .

Dispatch:  What is your name?

Son:  [states name].

. . .

Dispatch:  Okay.  If she returns give us a call back. I have officers in the area going to look for her, okay.

Son:  Okay.  I appreciate it. I didn't know who else to call or what else to do.

**{¶ 6}** After the 9-1-1 call was played in open court, the son testified that he had not actually seen his mother drinking that morning. Instead, he explained that he assumed she had been drinking because there was a bottle of alcohol in the house. When asked why he had made that assumption, the son responded: "My emotions, just a lot of emotions and stuff. I don't know." In response to a question from the prosecution about whether he had been arguing or experiencing other issues with his mother, he stated, "No, not really . . . . I don't recall. I don't know."

### 2. Officer Balli

**{¶ 7}** Officer Balli, a police officer with the Solon Police Department, testified that while on patrol on the morning of December 11, 2023, he received a dispatch alert about a possible impaired driver near D & M and the Giant Eagle Market District. Using the vehicle description provided, Officer Balli located the car parked in the Market District lot.

**{¶ 8}** He observed that the vehicle was running but improperly parked, occupying two spaces as the rear tires extended into an adjacent spot. Moore was seated in the driver's seat of the vehicle. Officer Balli approached the vehicle to speak with her.

**{¶ 9}** Footage recorded from Officer Balli's body camera — played in court during the suppression hearing and admitted into evidence — captured the full interaction. The video showed Officer Balli addressing Moore by her first name and introducing himself. He informed her that her son had contacted the police out of

concern for her well-being. When he asked where she was coming from, Moore replied that she had come from her home on SOM Center Road.

{¶ 10} Officer Balli told Moore that her son mentioned she had been drinking, which Moore denied. When asked what she was doing at Market District, Moore looked to her right, gestured down at something beside her in the car, and stated that she had just "gotten a bottle." She continued to deny having consumed any alcohol that day.

{¶ 11} At that point, Officer Balli asked Moore for her driver's license, stating that he was observing "some indicators [of impairment]." Moore handed over her license and responded, "no sir," in reference to his observation.

{¶ 12} When asked at the hearing about his initial interaction with Moore and what he had specifically observed, Officer Balli testified that he noticed signs of possible impairment, including bloodshot, watery eyes and mumbled speech.

{¶ 13} Officer Balli testified that he did not, however, detect an odor of alcohol on Moore. He further stated that Moore was able to retrieve her driver's license from her wallet promptly and without difficulty.

{¶ 14} As captured by body-camera footage, after reviewing Moore's driver's license, Officer Balli stepped away to confer with Sergeant Horvath, another Solon police officer who had arrived at the scene. Officer Balli informed Sergeant Horvath that he had observed some signs of impairment but did not detect the odor of alcohol. He asked Sergeant Horvath to speak with Moore to determine whether he

could detect any such odor.  After speaking with Moore, Sergeant Horvath returned and told Officer Balli that he "thought he smelled something."

{¶ 15} Officer Balli then conducted "pre-exit tests," which are sobriety assessments performed while the person is still inside the vehicle.  Specifically, Officer Balli asked Moore to recite the alphabet from the letter D to R and to count backward from 69 to 51.

{¶ 16} Officer Balli testified that Moore struggled with these tests.  She failed to correctly recite the specified section of the alphabet correctly and she was unable to count backward as instructed.  As more specifically shown in the body-camera footage, Officer Balli instructed Moore to recite the alphabet beginning with the letter "D" and ending with the letter "R."  Moore acknowledged this request by repeating the instructions.  Despite this, she began reciting the alphabet from the letter "A."  Moore also exhibited noticeable difficulty staying focused on the task.  She would pause and then start giggling.  She proceeded through the alphabet only as far as the letter "P," skipping or mumbling the letter "Q" unintelligibly.  She then continued with "R-T-U-V," overshooting the instructed stopping point and omitting the letter "S."

{¶ 17} With regard to the counting task, the body-camera footage shows that Moore, in counting backwards from 69, repeated the numbers 66 and 65 twice and only got to 62 before stopping and exclaiming "what?" — having apparently forgotten what she was supposed to be doing.

{¶ 18} Both Officer Balli's testimony and the body-camera footage confirm that following the results of the pre-exit tests, Moore was asked to exit the vehicle to perform standardized field sobriety tests.

### 3. Officer Stephens

{¶ 19} Officer Stephens, who also responded to the scene, conducted the standardized field sobriety tests. Officer Stephens testified that he conducted three tests: the horizontal gaze nystagmus, the walk-and-turn, and the one-leg stand. He testified that Moore failed all three tests. Officer Stephens further stated that during the administration of these tests, Moore exhibited slurred speech, an odor of alcohol, and slightly red, glossy eyes — all indicators of possible impairment.

{¶ 20} Moore's performance on the field sobriety tests was captured on Officer Balli's body-camera footage. The footage was also presented during the suppression hearing and admitted into evidence.

{¶ 21} Officer Stephens acknowledged that at the time he administered the tests he was still in training and had been directed to the scene by Sergeant Horvath, his field-training officer, in order to gain experience in conducting field sobriety tests. Officer Stephens admitted that his interaction with Moore was the first time he had performed any field sobriety tests and that he was receiving real-time guidance from Sergeant Horvath during the process. He also conceded that certain aspects of the tests were not conducted properly.

### 4. Sergeant Horvath

{¶ 22} Sergeant Horvath testified that, upon being asked by Officer Balli to speak with Moore, he detected the odor of alcohol. He explained that it is not uncommon for one officer to notice a smell that another might miss, as individuals vary in their sensory perception and sensitivity. Sergeant Horvath further noted that he has extensive experience as a field-sobriety test instructor. While he acknowledged that Officer Stephens may not have administered the field sobriety tests flawlessly, he testified that, based on his observations, the tests were conducted in a manner sufficiently compliant to establish probable cause to arrest Moore for OVI.

### B. Decision Granting Motion to Suppress

{¶ 23} On July 5, 2024, the trial court granted Moore's motion to suppress. In doing so, it framed the central issue as "whether the Officer[s] had a reasonable and articulable suspicion based on reasonable and articulable facts to extend a traffic stop into an OVI investigation." The court ultimately determined that the evidence presented at the suppression hearing failed to establish sufficient signs of impairment to provide the officers with the reasonable suspicion required to justify administering field sobriety tests.

{¶ 24} The City now appeals from that decision by raising the following assignment of error: "The trial court committed error prejudicial to the prosecution when it granted Defendant's Motion to Suppress."

**II. Law and Analysis**

**A. Standard of Review**

{¶ 25} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. When ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist. 1997).

**B. Reasonable Suspicion**

{¶ 26} Both the Fourth Amendment to the United States Constitution and Ohio Const. art. I, § 14 prohibit unreasonable searches and seizures. *State v. Mays*, 2008-Ohio-4539, ¶ 7. An investigatory stop is permissible if a law enforcement officer has a reasonable suspicion that the individual to be stopped may be involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Reasonable suspicion requires that the officer "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* at 21. "The propriety of an investigative stop by a police officer must be viewed in light

of the totality of the surrounding circumstances." *State v. Bobo*, 37 Ohio St.3d 177 (1988), paragraph one of the syllabus, *cert. denied* 488 U.S. 910 (1988). "Furthermore, these circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991), citing *United States v. Hall*, 525 F. 2d 857, 859 (D.C. Cir. 1976).

{¶ 27} In this case, the trial court framed the issue on the motion to suppress as "whether the Officer[s] had a reasonable and articulable suspicion based on reasonable and articulable facts to extend a traffic stop into an OVI investigation." However, this framing is inaccurate, as there was no initial traffic stop for one purpose that later evolved into an investigation for another. This case deviates from the scenario often seen in an OVI investigation where a police encounter begins with a traffic infraction or accident that establishes probable cause to initiate a stop, which leads to police interaction with the driver, which then leads to suspicion of OVI based on the officer's observations. Here, by contrast, Officer Balli located Moore's vehicle in direct response to a dispatch report concerning a suspected impaired driver in the area. From the outset, the sole purpose of the stop was to investigate the OVI allegation.

{¶ 28} The Ohio Supreme Court has held that a citizen informant's telephone tip — if found to be sufficiently reliable — can, on its own, establish reasonable suspicion to justify an officer's investigative stop of a motorist suspected of operating a vehicle under the influence. *See Maumee v. Weisner*, 87 Ohio St.3d 295, 296

(1999). However, the Court has also made clear that once a lawful and constitutional stop has been initiated, both the driver and the vehicle may only be detained for as long as reasonable suspicion of a legal violation persists. *State v. Chatton*, 11 Ohio St.3d 59, 62-63 (1984), *overruled on other grounds*.

{¶ 29} With these principles in mind, we consider whether the administration of field sobriety tests was supported by reasonable suspicion.

**1. Reasonable Suspicion to Detain Moore in Her Vehicle**

{¶ 30} We find that the initial detention of Moore in her vehicle was justified by reasonable suspicion based on the 9-1-1 call from Moore's son and the subsequent police dispatch based on that call.

{¶ 31} The Ohio Supreme Court has recognized that a telephone tip can, standing alone, create reasonable suspicion justifying an investigative stop if the tip has sufficient indicia of reliability. *Weisner*, 87 Ohio St.3d at paragraph one of the syllabus. Under these circumstances, the determination of reasonable suspicion is limited to an examination of the weight and reliability of the tip. *Id.* The focus is on "whether the tip itself has sufficient indicia of reliability to justify the investigative stop." *Id.* The most important factors in determining the reliability of an informant's report are "the informant's veracity, reliability, and basis of knowledge." *Id.*, citing *Alabama v. White*, 496 U.S. 325, 328 (1990).

{¶ 32} In assessing the reliability of the informant's tip, the Court in *Weisner* stated that it is useful to categorize informants according to their typical characteristics. *Weisner* at 300. It has generally been accepted that there are three

classes of informants: the anonymous informant, the known informant, and the identified citizen informant. *Id.* The Court explained:

> While the United States Supreme Court discourages conclusory analysis based solely upon these categories, insisting instead upon a totality of the circumstances review, it has acknowledged their relevance to an informant's reliability. The court has observed, for example, that an anonymous informant is comparatively unreliable and his tip, therefore, will generally require independent police corroboration. *Alabama v. White*, 496 U.S. at 329. The court has further suggested that an identified citizen informant may be highly reliable and, therefore, a strong showing as to the other indicia of reliability may be unnecessary: "If an unquestionably honest citizen comes forward with a report of criminal activity — which if fabricated would subject him to criminal liability — we have found rigorous scrutiny of the basis of his knowledge unnecessary." *Illinois v. Gates*, 462 U.S. 213, 233-234 (1983)

*Id.*

{¶ 33} Additionally, the Court in *Weisner* clarified that it is not necessary for all the facts relayed to the dispatcher to be included in the actual dispatch in order to establish that the stopping officer had reasonable suspicion to make the stop. *Weisner* at 297. Instead, the key inquiry is whether, based on the totality of the information available at the time, the dispatcher would have had reasonable suspicion to make the stop themselves, if in the position of the officer. *Id.*

{¶ 34} Applying *Weisner* to the facts at hand, it is evident that the 9-1-1 call and the resulting police dispatch was sufficiently reliable such that it provided officers with reasonable suspicion to initially detain Moore. The 9-1-1 call carried heightened reliability, as the caller was not only an identified citizen informant but also Moore's son. This familial relationship gave him personal knowledge of the

situation, enabling him to provide dispatch with a sufficiently detailed description of Moore's vehicle and its suspected location, which allowed officers to locate it. *See Weisner*, 87 Ohio St.3d at 302 (basis of knowledge also furthers credibility of the tip). Additionally, Moore's son informed dispatch that his mother had stopped drinking six months earlier but had recently relapsed. Moore's son further relayed to dispatch that based on his direct interaction with his mother that morning, he believed she had left the residence while intoxicated to purchase more alcohol. *See id.* (personal observations and immediate reporting of events lends credibility). The discovery of Moore's vehicle at a location where additional alcohol could be purchased further reinforced the son's credibility as a citizen informant, as did the overall tone and tenor of the call, as a genuine request for assistance made out of concern for his mother and the wellbeing of others on the road. *Accord Weisner* at 302 (where informant's primary motivation for the call was safety, it lends credibility to the reliability of the tip because it dispels concerns over dishonest and questionable goals).

{¶ 35} On appeal, Moore argues that the 9-1-1 call should be deemed unreliable based on statements made by her son during the suppression hearing — specifically, that he did not observe Moore consuming alcohol that morning (a claim her son never made during the 9-1-1 call), and that he was experiencing "a lot of emotions and stuff" at the time of the incident. Moore contends that, pursuant to *State v. Kepford*, 2004-Ohio-6486 (3d Dist.), her son's credibility must be established at the suppression hearing in order for the call to have been considered

reliable. We disagree. Unlike here, *Kepford* involved an anonymous tipster whose reliability had not been established at the time of the call, thus requiring corroboration at the hearing. In contrast, Moore's son was an identified citizen informant, and as such, his reliability is properly assessed based on the circumstances surrounding the 9-1-1 call and the information known and available to dispatch and responding officers at that time. *See Weisner* at 298 (facts precipitating the dispatch are what are assessed for reasonable suspicion of criminal activity).

{¶ 36} Considering the totality of the circumstances known to dispatch and Officer Balli at the time, we conclude that Officer Balli had reasonable suspicion to detain Moore in her vehicle upon locating it just minutes after the dispatch call.

## 2. Reasonable Suspicion to Conduct Field Sobriety Tests

{¶ 37} Having concluded that the 9-1-1 call and the corresponding police dispatch furnished the requisite reasonable suspicion to justify the initial investigatory stop of Moore and her vehicle, the dispositive issue becomes whether the facts developed during the stop undermined the original basis for suspecting an OVI offense, thereby rendering the administration of field sobriety tests constitutionally impermissible. *See State v. Angers*, 2021-Ohio-3640, ¶ 12-15 (3d Dist.) (holding that an initial stop based on a citizen-informant's tip was lawful, but subsequent interaction dissipated reasonable suspicion, rendering further detention for sobriety testing unlawful).

{¶ 38} As a preliminary matter, it is well established that field sobriety testing constitutes a seizure under the Fourth Amendment; however, it is deemed a limited intrusion requiring only reasonable suspicion, not probable cause, to be constitutionally valid. *See, e.g., State v. Keserich*, 2014-Ohio-5120, ¶ 8 (5th Dist.) Reasonable suspicion is defined as something more than a mere hunch, yet less than the level of certainty required for probable cause. *See State v. Ciminello*, 2018-Ohio-467, ¶ 16 (5th Dist.); *Cleveland v. Martin*, 2018-Ohio-740, ¶ 16 (8th Dist.) ("The city's burden to demonstrate reasonable and articulable suspicion of driving while under the influence of alcohol is not a high one.").

{¶ 39} Courts have recognized a nonexhaustive list of factors that may contribute to a reasonable suspicion of impairment, including:

> (1) the time and day of the stop (Friday or Saturday night as opposed to, e.g., Tuesday morning); (2) the location of the stop (whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer ("very strong," "strong," "moderate," "slight," etc.); (9) the suspect's demeanor (belligerent, uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given.

*State v. Evans*, 127 Ohio App.3d 56, 63, fn. 2 (11th Dist. 1998).  None of these factors are to be considered "in isolation," *see State v. Null*, 2020-Ohio-3222, ¶ 19 (3d Dist.),

and no single factor is determinative, *Evans* at 63, fn. 2. "However, courts generally uphold 'an officer's decision to conduct roadside sobriety tests . . . where the officer bases his decision on a number of factors.'" *Angers* at ¶ 27, quoting *Evans* at 63.

{¶ 40} Here, the trial court determined that, post-stop, Officer Balli lacked reasonable suspicion to justify conducting field sobriety tests.[2] The court emphasized that Moore did not exhibit erratic driving and that Officer Balli did not detect the odor of alcohol. While Officer Balli testified that Moore's speech was slurred — a pertinent indicator of impairment — the court rejected this assertion, finding it unsupported by video evidence, though it did not elaborate on how the video contradicted the testimony.

{¶ 41} The trial court also highlighted certain factors it viewed as inconsistent with impairment: Moore denied consuming alcohol, the stop occurred at approximately 11:00 a.m., she was cooperative, and she retrieved her driver's license without difficulty.

---

[2] In granting the motion to suppress, the trial court addressed whether pre-exit, nonstandardized field sobriety tests — like their standardized counterparts — require a preliminary showing of impairment before they can be administered. The court concluded that because these tests serve as investigative tools to assess a suspect's sobriety during an OVI investigation, they may only be conducted when reasonable suspicion of OVI exists.

On appeal, we find it unnecessary to revisit the trial court's determination. Regardless of whether reasonable suspicion is required prior to administering pre-exit, nonstandardized tests, the officers in this case already possessed reasonable suspicion of OVI at the time the tests were performed. Therefore, any issue concerning whether such tests may be used to develop reasonable suspicion is moot, and further discussion on this issue would be purely advisory. *Accord see State v. Elston,* 2006-Ohio-3733, ¶ 5 (8th Dist.) (appellate courts should refrain from issuing advisory opinions on questions of law nonessential to the outcome on appeal).

{¶ 42} Ultimately, the court found that the field sobriety tests were based solely on: (1) a tip from a known citizen informant and (2) the observation that Moore's eyes were bloodshot. The court noted that even if it were to consider Sergeant Horvath's comment that he thought he smelled "something" resembling alcohol, this, together with the informant's tip and Moore's bloodshot eyes, did not rise to the level of reasonable suspicion supported by specific and articulable facts sufficient to warrant OVI testing.

{¶ 43} While the trial court's analysis is careful, it gives insufficient weight to the 9-1-1 call and overlooks material, undisputed facts that significantly bolster the reasonableness of the officers' continued investigative detention.

{¶ 44} First, while no single *Evans* factor is dispositive in establishing reasonable suspicion of impairment, the 9-1-1 call placed by Moore's son warrants substantial weight in this case. As discussed above, the call originated from a highly reliable source — Moore's own son — who personally observed signs of his mother's impairment immediately prior to contacting emergency services. The reasonable suspicion arising from this call did not terminate upon Officer Balli's initial detention of Moore. Rather, it persisted throughout the detention, as the officers' subsequent observations corroborated the son's report. *See State v. Hughes*, 2019-Ohio-2690, ¶ 27 (7th Dist.) (recognizing that reasonable suspicion to conduct field sobriety tests must be evaluated in light of the totality of the circumstances, encompassing those occurring both prior to and during the stop).

{¶ 45} Notably, the trial court failed to address testimony and video evidence showing that Moore's vehicle was improperly parked — straddling two parking spaces in a grocery-store lot. Also unacknowledged was Moore's admission, during the stop, that she had just purchased alcohol, as well as her gesture toward the bottle on the passenger seat. These facts directly corroborated the son's report that Moore had been driving while impaired and had gone to buy more alcohol, reinforcing the officers' reasonable suspicion and justifying the continued detention and subsequent OVI sobriety testing. *See White*, 496 U.S. at 332 (an informant's ability to predict a suspect's future conduct enhances the reliability of the tip and supports the reasonableness of police reliance).

{¶ 46} Although we recognize that it is not our role to second-guess the trial court's factual findings when they are supported by competent and credible evidence, *see Burnside*, 2003-Ohio-5372, at ¶ 8, we respectfully disagree with the trial court's determination that Officer Balli's testimony regarding Moore's slurred speech was not corroborated by the video evidence. *See Middleburg Hts. v. Wojciechowski*, 2015-Ohio-3879, ¶ 18 (8th Dist.) (reversing where video footage clearly contradicted trial court's finding). The video recording of Officer Balli's initial interaction with Moore reveals slurred speech, thus substantiating his account rather than undermining it.

{¶ 47} We do not dispute that Moore denied alcohol consumption, that she was cooperative, and that the stop occurred in the late morning. Nor do we ignore the lack of observed erratic driving. However, these facts, when viewed together and

against the backdrop of the totality of the circumstances known to the police officers at the time, do not overcome the reasonable suspicion of impairment already established. *See State v. Brown*, 2016-Ohio-1258, ¶ 11, fn. 3 (2nd Dist.). ("The possibility of an innocent explanation does not negate the existence of reasonable suspicion," citing *Navarette v. California*, 572 U.S. 393, 403 (2014).).

{¶ 48} By the time officers proceeded to administer field sobriety tests — beginning with the alphabet and counting tests — reasonable suspicion of impairment was supported by the following articulable facts: (1) a highly reliable 9-1-1 call from Moore's son, reporting that his mother was driving while intoxicated and had departed to purchase more alcohol; (2) Moore's presence in the driver's seat of her vehicle, which was improperly parked at a grocery store; (3) her admission to having just purchased alcohol, consistent with the 9-1-1 tip; (4) her slurred speech, confirmed by video evidence; and (5) her bloodshot and watery eyes.

{¶ 49} Taken together and viewed through the eyes of a reasonable police officer on the scene reacting to events as they unfolded, *see Andrews*, 57 Ohio St.3d at 87-88, these facts were sufficient to give rise to reasonable suspicion of impairment, thereby justifying the administration of field sobriety testing consistent with the Fourth Amendment. *See, e.g., State v. Mapes,* 2005-Ohio-3359, ¶ 42 (6th Dist.) (finding officer had reasonable and articulable suspicion to detain defendant for sobriety testing when the officer observed an odor of alcohol, bloodshot and glassy eyes, and slurred speech at two in the morning). Accordingly, the City's sole assignment of error is sustained.

## III.  Conclusion

{¶ 50} For the foregoing reasons, we reverse the trial court's grant of Moore's motion to suppress.  We remand to the trial court for further proceedings consistent with this opinion.

{¶ 51} Judgment reversed and cause remanded to the trial court for proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Bedford Municipal Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

MARY J. BOYLE, J., and
DEENA R. CALABRESE, J., CONCUR