[Cite as *State v. Myers*, 2026-Ohio-1334.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

CASE NO. 1-25-49

v.

ANDREW J. MYERS,

    DEFENDANT-APPELLANT.

OPINION AND
JUDGMENT ENTRY

Appeal from Allen County Common Pleas Court
Trial Court No. CR2024 0191

Judgment Affirmed

Date of Decision: April 13, 2026

APPEARANCES:

    *April F. Campbell* for Appellant

    *John R. Willamowski, Jr.* for Appellee

Case No. 1-25-49

**WALDICK, J.**

{¶1} Defendant-appellant, Andrew Myers ("Myers"), appeals the August 7, 2025 judgment of conviction and sentence entered against him in the Allen County Court of Common Pleas, following Myers' plea of no contest to Operating a Vehicle While Under the Influence of a Listed Controlled Substance or a Listed Metabolite of a Controlled Substance ("OVI"). On appeal, Myers specifically challenges the decision of the trial court overruling motions to suppress filed by Myers. For the reasons set forth below, we affirm.

*Background Facts and Procedural History*

{¶2} This case stems from a December 30, 2023 traffic stop conducted by Patrolman Justin Wireman of the Lima Police Department. On that date, at approximately 3:50 a.m., Wireman observed a car traveling northbound on South Main Street in Lima in excess of the posted 25 mile per hour speed limit. As a result, Wireman stopped the vehicle, which was being driven by Myers. Based on observations made by Patrolman Wireman during his initial interaction with Myers following the stop, the officer asked Myers if he had been drinking and Myers acknowledged having had two drinks earlier in the night. Wireman then conducted an abbreviated horizontal gaze nystagmus ("HGN") test on Myers' eyes while Myers was still seated in his vehicle. Wireman observed nystagmus in both of Myers' eyes, which is a sign of impairment. Patrolman Wireman requested that Myers exit his vehicle, so that Wireman could administer several standard field

sobriety tests. Based on indicators of impairment observed during those field sobriety tests, Myers was placed under arrest for OVI. Myers was then transported to the Lima Police Department, where he agreed to provide a urine sample after having been read the required BMV 2255 form. Laboratory analysis of the urine sample collected from Myers was subsequently conducted and the results of that testing reflected the presence of marijuana metabolite in Myers' urine.

{¶3} On August 15, 2024, an Allen County grand jury returned a two-count indictment against Myers. Count 1 of the indictment charged Myers with OVI based on a concentration of marijuana metabolite in his urine of at least thirty-five nanograms per milliliter of urine, in violation of R.C. 4511.19(A)(1)(j)(viii)(II), a fourth-degree felony based on the additional allegation that Myers had previously been convicted of or pleaded guilty to three OVI violations. Count 2 of the indictment charged Myers with OVI based on the general allegation that he had been under the influence of alcohol, a drug of abuse, or a combination of the same, in violation of R.C. 4511.19(A)(1)(a), a fourth-degree felony based on the additional allegation that Myers had previously been convicted of or pleaded guilty to three OVI violations.

{¶4} On August 28, 2024, Myers filed a written plea of not guilty to both counts in the indictment.

{¶5} On October 15, 2024, Myers filed two motions to suppress. In the first motion, Myers moved to suppress the urine test results, alleging that the urine had

not been collected and tested in accordance with the requirements of Chapter 3701-53 of the Ohio Administrative Code. In the second motion, Myers moved to suppress the observations of Patrolman Wireman during the stop of Myers' vehicle and, specifically, the results of the field sobriety tests, alleging that the initial stop of Myers' vehicle was not supported by probable cause or reasonable suspicion and, further, that the traffic stop was impermissibly expanded without proper legal cause to ask that Myers submit to field sobriety tests.

{¶6} A suppression hearing was held on January 27, 2025 and on March 31, 2025, following which the trial court took the suppression issues under advisement.

{¶7} On April 22, 2025, the trial court filed a judgment entry in which Myers' motions to suppress were overruled.

{¶8} On May 20, 2025, a change of plea hearing was held. At that time, Myers entered a negotiated plea of no contest to Count 1 of the indictment. Pursuant to the plea agreement, the prosecution dismissed Count 2 of the indictment. The trial court accepted the no contest plea and found Myers guilty on Count 1. The trial court then ordered a presentence investigation.

{¶9} On August 7, 2025, a sentencing hearing was held. Myers was sentenced to a two-year term of community control, the conditions of which included a mandatory 60 days in jail. On that same date, the trial court journalized its sentencing orders.

Case No. 1-25-49

**{¶10}** On September 5, 2025, Myers filed the instant appeal, in which he raises three assignments of error for our review.[1]

### First Assignment of Error

**Patrolman Wireman did not have reasonable suspicion that Myers was under the influence of alcohol and or drugs to ask him to perform field sobriety tests.**

### Second Assignment of Error

**The field sobriety tests should have been deemed inadmissible.**

### Third Assignment of Error

**The State failed to meet its burden that the urine test was admissible.**

*Standard of Review – Motions to Suppress*

**{¶11}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside,* 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson,* 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *State v. Roberts,* 2006-Ohio-3665, ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Burnside*, at ¶ 8.

---

[1] Myers' merit brief lists two assignments of error in the "Assignments of Error" section of the brief; however, the body of the merit brief sets forth three assignments of error.

*Evidence Presented at the Suppression Hearing*

**{¶12}** At the January 27, 2025 suppression hearing held in this case, the State of Ohio called Patrolman Justin Wireman as its first witness. The defense stipulated that, at the time in question, Wireman was employed by the Lima Police Department, was on traffic patrol, was wearing the uniform of the day, was in a marked cruiser, and that Wireman is a lawfully trained and certified police officer. The defense further stipulated that the initial traffic stop of Myers' vehicle, for speeding, was legally valid. The parties further stipulated to the admission of two exhibits, State's Exhibits 1 and 2, which contained audio-video footage from Patrolman Wireman's body camera and cruiser camera, respectively, during the traffic stop at issue.

**{¶13}** Upon taking the stand, Patrolman Wireman testified that on Saturday, December 30, 2023, at approximately 3:50 a.m., he was conducting stationary patrol on South Main Street in the City of Lima. Wireman was in his cruiser, which was facing southbound, and he was monitoring northbound traffic. Wireman testified that the area where he was located is a hotspot for impaired and erratic driving in the very early morning hours on weekends, due to several bars and after-hours party establishments being located nearby. As Patrolman Wireman was watching traffic from that location, he observed Myers' vehicle approaching from the south, driving northbound. Myers' vehicle stopped at a stop sign and then accelerated rapidly in Wireman's direction. Wireman believed that the vehicle was traveling above the

twenty-five mile per hour speed limit and, upon activating the radar unit in his cruiser, confirmed that the vehicle driven by Myers was traveling at thirty-three miles per hour. As the vehicle drew nearer to Wireman's location, the vehicle's speed increased to thirty-eight miles per hour. Once the vehicle passed Wireman's location, he pulled out to follow Myers' vehicle and then conducted a traffic stop on Main Street between Second and Third Streets.

{¶14} Upon stopping Myers' car, Patrolman Wireman approached the driver's door window and spoke with Myers. Nearly immediately, Wireman noticed that Myers' speech was slurred and his eyes were bloodshot and glassy. Wireman requested Myers' driver's license and proof of insurance but, in response, Myers handed over his license and registration. Patrolman Wireman again requested proof of insurance, and Myers was able to use his cell phone to pull up his insurance information. As Patrolman Wireman conversed with Myers about the traffic stop, Wireman continued to note that Myers' speech was slightly slurred and Wireman could smell the odor of alcohol coming from the vehicle, of which Myers was the sole occupant. Wireman asked Myers if he had been drinking that evening. In response, Myers stated that he drank earlier in the night and his last drink was at approximately 10:00. Later in that initial conversation, Myers stated that he had had two drinks. Patrolman Wireman also detected an odor of marijuana coming from Myers' car.

{¶15} Patrolman Wireman then asked if he could perform an abbreviated horizontal gaze nystagmus ("HGN") test on Myers' eyes as he sat in his vehicle. Upon performing that abbreviated and unofficial test, Wireman noticed that Myers had nystagmus, which is the involuntary jerking of the eye. As a result of the observations made during his initial interaction with Myers up to that point, Patrolman Wireman asked Myers to complete a field sobriety test, and Myers agreed to submit to the test.

{¶16} Patrolman Wireman testified that he had been trained with regard to standard field sobriety testing, initially in the police academy and then in follow-up trainings through the years that he had been a police officer. Wireman testified that his training on field sobriety testing was based on the National Highway Traffic Safety Administration ("NHTSA") manual and that, while he does not know the manual word for word, he is familiar with it. Wireman then identified State's Exhibit 3 as the portion of the NHTSA manual setting forth the procedures for standardized field sobriety testing. Counsel for the parties noted at that point that State's Exhibit 3 was the February, 2023 version of the manual, being the most recent version.

{¶17} Regarding the field sobriety tests administered in this case, Patrolman Wireman testified that first he asked Myers to exit his vehicle. As Myers did so, Wireman noticed that Myers had to grab or touch the side of his car to gain his

balance before starting to walk. Patrolman Wireman asked Myers if he had any injuries that would affect the test, and Myers stated he did not.

{¶18} Patrolman Wireman testified that the first test performed was the HGN test, which he started by explaining the test to Myers, instructing him to keep his head still and to follow the movements of a pen held by Wireman with eyes only. Wireman then held a pen in front of Myers' nose at a distance of twelve to fourteen inches, so that Myers could actually focus on the pen. Wireman initially made two rounds of movement with the pen, moving it first to his right, and then to his left, while checking Myers' eyes for movement, before taking the pen, or stimulus, away. Wireman then put the stimulus back in front of Myers' nose and moved it from right to left. Wireman testified that he was looking for an involuntary jerking of the eye as the stimulus goes from right to left, and that both the right eye and left eye are checked. Once that was done, Wireman checked for sustained nystagmus at maximum deviation, meaning that the pen was then moved, first to the right and then to the left, to a point where Wireman could no longer see the white in the corner of Myers' left eye and then right eye, respectively, and then Wireman held the pen still in that position for at least four seconds in each direction. Wireman testified that the purpose of that part of the test was to check to see if either eye, or both, continued to move while he held the pen stationary at that outward point. Patrolman Wireman testified that, with regard to the HGN test, there are six possible clues that might be observed which indicate that the subject of the test is intoxicated. During

the HGN test administered to Myers, Wireman observed the maximum six clues. Wireman then also conducted vertical nystagmus testing, and observed no clues.

{¶19} Patrolman Wireman next had Myers move to the sidewalk, which was a flat surface. Wireman testified that, because he was going to have Myers do a walk and turn test and a one-legged stand test, it was important that Myers not be standing on a slope that might affect his ability to properly do the test.

{¶20} Once on the sidewalk, Wireman administered the walk and turn test, during which he asked Myers to imagine a straight line in front of him, and to then put his left foot on that line, and then to take his right foot and place it in front of the left foot in a heel-to-toe fashion, so that the right heel is touching the left foot. Myers attempted to get into that starting position but could not hold the position for any length of time, as he kept stepping out of the position or losing his balance. Patrolman Wireman then explained the test, instructing Myers that he was to take nine heel-to-toe steps, touching heel to toe on every step, while counting each step out loud and not using his arms for balance. Wireman instructed Myers that once he got to the ninth step, he was to pivot on his left foot, making small steps with his right foot, to then turn around and return in the same fashion, taking nine heel-to-toe steps, touching heel to toe on every step, while counting each step out loud and not using his arms for balance. Wireman asked Myers if he understood, and Myers indicated that he did. Wireman then demonstrated the test for Myers, doing an

abbreviated demonstration with three steps. Myers again noted that he understood and began the test.

{¶21} Patrolman Wireman testified that, during that test, Myers stepped off the line two times and planted his foot a few times throughout the first nine steps of the test. Myers also failed to touch heel to toe and turned incorrectly. Once he turned around, Myers asked Wireman what it was that he was supposed to do at that point. Myers then returned, again failing to touch heel to toe on two steps, stepping off the line, and stopping in between steps multiple times.

{¶22} Patrolman Wireman further testified that, during the walk and turn test, he shined his very bright flashlight toward the ground, which provided adequate light for Myers to see to perform the test.

{¶23} Patrolman Wireman testified that the last test conducted was the one-legged stand test. In that test, the subject is asked to stand in a "starting position", with feet together and hands down at his sides. Once that was done, Wireman explained to Myers that he needed to pick up one leg, whichever leg he was more comfortable using, and hold the leg approximately six inches off the ground while pointing his toes straight down the sidewalk. Myers was instructed that he then needed to look at his toes and count out loud, one thousand one, one thousand two, and so on, until told to stop. Myers was instructed that, while doing so, he was not to bring his arms up for balance. Patrolman Wireman asked Myers if he understood, and Myers said he did. Wireman then demonstrated the test, and Myers again

acknowledged that he understood. Wireman then told Myers he could begin the one-legged stand test.

{¶24} Patrolman Wireman testified that, during that test, Myers put his foot down on the count of two and the count of four, and then picked up his foot and bent his leg to the point where it wasn't straight out in front of him. Myers got to approximately the count of twenty, at which point he started to pivot and hop on his leg. Wireman then stopped the test, because he did not want Myers to fall down or hurt himself.

{¶25} After those three tests were completed, Wireman asked Myers how he would rate himself on a sliding scale, with one being very sober and ten being extremely intoxicated or impaired. Myers responded that he was either a one or a two.

{¶26} Patrolman Wireman then advised Myers that, due to signs of impairment that had been observed, he was being placed under arrest for OVI. Wireman asked Myers if, after being read the formal form, he would submit to a breath test. At that point, Wireman learned that Myers had multiple prior OVI convictions. Once Wireman confirmed that the current OVI arrest would be for a felony, he transported Myers to the Lima Police Department in order to request a urine sample.

{¶27} Upon arriving at the police station, Myers was taken to a small holding room and Wireman read Myers the official BMV 2255 form, which explained the

potential penalties for submitting or not submitting to a test. Wireman then asked Myers to provide a urine sample, and Myers consented to do so.

{¶28} In obtaining the urine sample, Patrolman Wireman asked Myers if he needed to urinate, and Myers said he did. Wireman then opened a pre-made test kit provided to the police department by the Lucas County toxicology lab. Wireman walked Myers to a nearby bathroom, with Wireman maintaining control of the cup, or container, for the urine until they reached the bathroom, where he handed the cup to Myers to urinate in. Myers urinated into the cup, filling it approximately halfway, and then handed it back to Wireman, who immediately replaced the screw-top cap on the container. After Myers had finished using the bathroom and had washed his hands, Wireman escorted Myers back to the holding room. At that time, which was approximately 4:20 a.m., Patrolman Wireman adhered the anti-tampering evidence seal to the screw-top of the urine container, and filled out identifying information on that seal. Wireman placed the bottle and an information sheet for the lab in a plastic bag that is provided with the test kits, and placed the bag containing the urine sample and the paperwork back into the box. He then sealed the box, so that it could immediately be placed into the U.S. mail to be shipped to the lab in Lucas County. Finally, Patrolman Wireman testified on direct examination that Myers was then released to a person he had called to come and pick him up.

{¶29} On cross-examination, Patrolman Wireman testified that he had initially been trained on standardized field sobriety testing ("SFST") in college in

approximately 2004, that he had completed several updated SFST courses since that time, with the most recent training having been in 2019. With regard to the traffic stop at issue, Wireman confirmed that Myers' speeding was the only "bad driving" observed by the officer prior to making the traffic stop. Wireman testified, as he had on direct examination, that Myers handed over his license and registration when asked for his license and insurance information. Patrolman Wireman acknowledged that, when asked again for the insurance information, Myers was able to sort through the apps on his phone and pull up the requested information. Wireman testified that, upon walking up to Myers' car after stopping it, Myers' slightly slurred speech was immediately noticeable. Wireman acknowledged that he was unaware of what Myers' speech sounds like normally; however, Wireman testified that there were several times that Myers' speech was slightly slurred as the traffic stop continued. Patrolman Wireman confirmed that Myers did not fumble with his fingers when using his phone, and that Myers answered the officer's questions in a clear manner.

{¶30} When asked about the abbreviated, or partial, HGN test that he initially performed while Myers was still in the stopped car, Patrolman Wireman testified that such a test is not scientifically validated to his knowledge and he confirmed that the initial HGN testing he performed was not a full HGN test. Wireman reiterated his prior testimony that Myers was slightly unsteady on his feet when he got out of his car, and that Myers leaned towards and brushed up against the car with his hand to steady himself.

{¶31} When asked about the three standardized field sobriety tests that were ultimately conducted in the case, Wireman testified that, in his opinion, those three tests would reveal impairment due to alcohol or drugs. However, Wireman testified that he did not know if the NHTSA had yet recognized those tests as valid indicators for impairment due to drugs, as opposed to alcohol. With regard to the odor of marijuana that he smelled coming from Myers' car, Patrolman Wireman acknowledged that he neglected to include that detail in his report.

{¶32} When asked on cross-examination whether he had questioned Myers about any prior concussions or neurological injuries, Patrolman Wireman testified that those conditions fall under the category of "injuries" generally, which he did ask Myers about. Wireman confirmed that he did not specifically ask Myers if he had any inner ear problems or problems with his eyesight. Wireman also acknowledged that he did not specifically ask Myers if he had any back or leg issues, because such things also fall under the category of "injuries", which he had questioned Myers about.

{¶33} Finally, Patrolman Wireman testified briefly on cross-examination about collecting the urine sample from Myers, filling out the paperwork, sealing the box, and placing the completed test package in a special outgoing mailbox at the Lima Police Department.

{¶34} On redirect-examination, Patrolman Wireman testified that, prior to administering the abbreviated HGN test, he felt that, based on all of his other

observations, he had adequate suspicion to ask Myers to submit to field sobriety tests. Wireman also testified that, based on having administered field sobriety tests approximately five hundred times during his law enforcement career, it was his experience that when he would ask generally about any injuries, people would tell him if they had back problems, head injuries, or trouble with their eyes. Patrolman Wireman testified that Myers did not indicate that he had anything physically wrong with him.

{¶35} On recross-examination, Patrolman Wireman acknowledged that bloodshot or glassy eyes can also be caused by conditions other than using intoxicating substances.

{¶36} At the January 27, 2025 suppression hearing, the State of Ohio also presented the testimony of Jennifer Swatek, a forensic toxicologist employed by NMS Labs. Swatek testified that NMS Labs is a private toxicology laboratory that conducts testing of biological fluids for intoxicating substances. Swatek testified that she has a Bachelor's of Science degree from Northern Michigan University in forensic biochemistry, and a Master's of Science degree in forensic science from Arcadia University. Swatek testified that she has performed controlled substance analysis upon hundreds of thousands of samples throughout her nearly 13-year career at NMS, and that she had testified in court about such analyses on numerous occasions.

**{¶37}** Swatek confirmed that, in the instant case, NMS Labs had been asked by Lucas County Toxicology to perform testing for cannabinoid metabolite in a urine sample. Swatek testified that, while she was not the actual NMS employee who tested the urine sample at issue, she then did her own independent data analysis on the results of the instrumental testing and she authored the report setting forth the results of that analysis. Swatek explained the scientific methods and "assembly line" testing procedure utilized by NMS Labs. Swatek further testified about how samples of bodily fluids, including the sample in this case, are prepared and tested using instrumental analysis by a single laboratory technician, and how the test results are then analyzed. Swatek confirmed that samples to be tested are refrigerated in secured storage, that a chain of custody of each sample is maintained, and that specific protocols exist and are followed in all aspects of the testing. Swatek testified that the lab keeps daily maintenance logs on its equipment and that tests are run for quality control prior to any sample being tested. Swatek testified that valid permits are in place from the Ohio Department of Health for the testing done by NMS Labs.

**{¶38}** Following the presentation of evidence at the January 27, 2025 hearing, a continuation of that hearing was held on March 31, 2025. At the March 31, 2025 hearing, the prosecution presented the testimony of Robin Shinaver, the director of the toxicology lab of the Lucas County Coroner's Office. With regard to the instant case, Shinaver testified that her lab had received a urine sample on

which the lab was asked to run a bottle screen and confirmation, and then a drug screen and confirmation. Shinaver testified that due to the testing required on the urine sample, a portion of the sample was sent from Lucas County to NMS Labs in Pennsylvania for a cannabinoids panel to be done. Shinaver confirmed that the remaining portion of the parent sample originally received by Lucas County in the case had been retained by that lab.

*Analysis of Assignments of Error*

*First Assignment of Error*

**{¶39}** In the first assignment of error, Myers asserts that the arresting officer, Patrolman Wireman, did not have a reasonable suspicion that Myers was under the influence of alcohol or drugs, as required to expand the initial traffic stop for speeding to include field sobriety tests.

As this Court explained in *State v. Angers*, 2021-Ohio-3640 (3d Dist.):

"[T]here are three distinct stages in the typical * * * [OVI] scenario: (1) the initial stop; (2) the request that the driver submit to field sobriety tests; and (3) the arrest." *State v. Dierkes*, 11th Dist. Portage No. 2008-P-0085, 2009-Ohio-2530, ¶ 18, quoting *State v. Richards*, 11th Dist. Portage No. 98-P-0069, 1999 Ohio App. LEXIS 4860, 1999 WL 1580980, *2 (Oct. 15, 1999). "In order to warrant removing a person from his vehicle to conduct field sobriety tests, a police officer must have reasonable articulable suspicion to believe that the person was driving under the influence of drugs or alcohol." *State v. Swartz*, 2d Dist. Miami No. 2008 CA 31, 2009-Ohio-902, ¶ 11, quoting *State v. Knox*, 2d Dist. Greene App. No. 2005-CA-74, 2006-Ohio-3039, ¶ 11.

"Whether an officer had a reasonable, articulable suspicion to administer field sobriety tests is a 'very fact-intensive'

determination." *State v. Santiago*, 195 Ohio App.3d 649, 2011-Ohio-5292, 961 N.E.2d 264, ¶ 13, quoting *State v. Wells*, 2d Dist. Montgomery No. 20798, 2005-Ohio-5008, ¶ 9. In deciding whether a police officer has a sufficient legal justification to administer field sobriety tests, courts have considered the following factors:

(1) the time and day of the stop (Friday or Saturday night as opposed to, e.g., Tuesday morning); (2) the location of the stop (e.g., whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer ('very strong,' 'strong,' 'moderate,' 'slight,' etc.); (9) the suspect's demeanor (belligerent, uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given.

*State v. Schriml*, 3d Dist. Marion No. 9-12-32, 2013-Ohio-2845, ¶ 26, quoting *State v. Evans*, 127 Ohio App.3d 56, 711 N.E.2d 761, fn. 2 (11th Dist. 1998). None of these factors are to be considered "in isolation." *State v. Null*, 3d Dist. Logan No. 8-19-50, 2020-Ohio-3222, ¶ 19. However, courts generally uphold "an officer's decision to conduct roadside sobriety tests * * * where the officer bases his decision on a number of factors." *Evans* at 63.

*Id*., at ¶¶ 26-27.

{¶40} "The Supreme Court of Ohio has defined 'reasonable articulable suspicion' as 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion [upon an individual's freedom of movement].'" *State v. Shaffer*, 2013-Ohio-3581, ¶ 18 (3d Dist.),

quoting *State v. Bobo*, 37 Ohio St.3d 177, 178, (1988), quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).

**{¶41}** "Importantly, reasonable suspicion [to support requesting field sobriety tests] does not require an officer to observe and relate overt signs of intoxication." *State v. Null*, 2020-Ohio-3222, ¶ 18 (3d Dist.), citing *Cleveland v. Martin*, 2018-Ohio-740, ¶ 14 (8th Dist.). "Rather, '[a] court will analyze the reasonableness of the request based on the totality of the circumstances, viewed through the eyes of a reasonable and prudent police officer on the scene who must react to events as they unfold.'" *Null*, at ¶ 18, quoting *Cleveland v. Maxwell*, 2017-Ohio-4442, ¶ 20 (8th Dist).

**{¶42}** In the instant case, Myers acknowledges that he, while driving, was validly stopped by Patrolman Wireman for a speeding infraction. However, Myers asserts that there was no evidence of erratic or impaired driving; that other than having slightly slurred speech upon initially speaking with Patrolman Wireman, Myers carried on a sober-sounding conversation with the officer; that Myers showed awareness and clearness of intellect while speaking with the patrolman; and that Myers was able to access his insurance information on his phone without difficulty. Based on those facts, Myers argues that Patrolman Wireman lacked a reasonable suspicion that Myers was under the influence of alcohol or drugs, as required to expand the initial traffic stop for speeding to include field sobriety tests.

**{¶43}** Upon our de novo application of the test adopted in *Angers*, *supra*, to the facts of this case, we conclude that the trial court did not err in determining that, upon the totality of the circumstances, Patrolman Wireman had a reasonable suspicion to prolong the valid traffic stop in order to administer field sobriety tests.

**{¶44}** The stop was initiated at 3:50 a.m., early Saturday morning, on a street in an area of Lima known by police to be a corridor for driving to nearby after-hours drinking establishments after the local bars close. Patrolman Wireman initiated the traffic stop because Myers was engaged in erratic driving, to the extent he failed to conform the speed of his vehicle to the posted speed limit. Myers' eyes were both bloodshot and glassy, and his speech was slightly slurred. Myers continued to slur his speech in that manner while speaking with the officer during the initial part of the traffic stop. The odors of alcohol and marijuana were emanating from the vehicle driven by Myers, of which he was the only occupant. While Myers ultimately provided the requested driver's license and insurance documentation, and was able to work his phone to retrieve his insurance information, he initially demonstrated an inability to understand and/or comply with Patrolman Wireman's request to see a driver's license and proof of insurance. Finally, Myers admitted to having consumed alcohol earlier that night, although he claimed to have had only two drinks.

{¶45} Under the totality of those circumstances, there was reasonable suspicion to request that Myers perform field sobriety tests, which existed prior to the administration of any type of testing.

{¶46} The first assignment of error is overruled.

*Second Assignment of Error*

{¶47} In the second assignment of error, Myers argues that the trial court erred in ruling that the State of Ohio met its burden in establishing that the field sobriety tests, and the results thereof, were admissible. Specifically, Myers notes that the arresting officer, Patrolman Wireman, testified that his last formal training on field sobriety tests occurred in 2019. Myers asserts that Wireman was therefore not familiar with the governing standards for such tests in effect at the time the field tests were administered in this case, and that Wireman failed to screen, or question, Myers about potential injuries or physical limitations that could impact his ability to perform the tests.

{¶48} The admissibility of results of field sobriety tests in OVI prosecutions is governed by R.C. 4511.19(D)(4)(b), which provides in relevant part:

> In any criminal prosecution * * * for a violation of division (A) or (B) of this section, * * * if a law enforcement officer has administered a field sobriety test to the operator of the vehicle involved in the violation and if it is shown by clear and convincing evidence that the officer administered the test in substantial compliance with the testing standards for any reliable, credible, and generally accepted field sobriety tests that were in effect at the time the tests were administered, including, but not limited to, any testing standards then

in effect that were set by the national highway traffic safety administration, all of the following apply:

(i) The officer may testify concerning the results of the field sobriety test so administered.

(ii) The prosecution may introduce the results of the field sobriety test so administered as evidence in any proceedings in the criminal prosecution * * * .

{¶49} The Supreme Court of Ohio has noted that, in other words, R.C. 4511.19(D)(4)(b) dictates that "the results of the field sobriety tests are not admissible at trial unless the state shows by clear and convincing evidence that the officer administered the test in substantial compliance with NHTSA guidelines." *State v. Codeluppi*, 2014-Ohio-1574, ¶ 11. On the other hand, the Ohio Supreme Court has also made clear that the testimony of a law enforcement officer regarding observations made during the administration of field sobriety tests is admissible in the absence of strict compliance with the NHTSA guidelines. *See e.g., State v. Boczar*, 2007-Ohio-1251.

{¶50} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Errors that are excusable under the substantial-compliance standard are characterized as "minor procedural deviations." *State v.*

*Burnside*, 2003-Ohio-5372, ¶ 34, citing *State v. Homan*, 89 Ohio St.3d 421 (2000), *superseded by statute on other grounds as recognized in State v. Boczar*, 2007-Ohio-1251.

**{¶51}** At the suppression hearing in the instant case, admitted into evidence as State's Exhibit 3 was a copy of Session 8 of the 2023 NHTSA DWI Detection and Standardized Field Sobriety Testing manual. Upon this Court's independent review of the evidence presented at the suppression hearing, in light of the standards set forth in State's Exhibit 3, we conclude the State of Ohio established by clear and convincing evidence that Patrolman Wireman substantially complied with the guidelines for field sobriety testing established by the NHTSA. The overall evidence relating to the field sobriety testing in this case reflects no substantial deviation from the standards set forth in the NHTSA manual for the full horizontal gaze nystagmus test, the walk and turn test, and the one-legged stand test. While Patrolman Wireman did not go through a check-list of medical questions with Myers prior to conducting the tests, Wireman did ask Myers if he had any injuries that would affect his ability to perform the tests and Myers answered he did not. We further note that Myers does not claim to have had any physical impairments that Patrolman Wireman failed to identify prior to proceeding with the testing. Accordingly, any minor procedural deviation with regard to questioning Myers about specific physical limitations does not warrant suppression. *Accord State v. Abaev*, 2025-Ohio-1108 (5th Dist.); *State v. Tisch*, 2018-Ohio-5323 (9th Dist.).

-24-

{¶52} As the trial court did not err by concluding that Patrolman Wireman administered the field sobriety tests in substantial compliance with the NHTSA standards, the second assignment of error is overruled.

*Third Assignment of Error*

{¶53} In the third assignment of error, Myers argues that the trial court should have suppressed the results of the urine test due to lack of compliance with the Ohio Department of Health regulations set forth in Chapter 3701-53 of the Ohio Administrative Code.

{¶54} As the Supreme Court of Ohio has noted, "[t]he legislature in Ohio has directed that in a criminal prosecution for a violation of R.C. 4511.19(A) or (B), a bodily substance shall be analyzed in accordance with methods approved by the director of health[.]" *State v. Baker*, 2016-Ohio-451, ¶ 16, citing R.C. 4511.19(D)(1)(b). Pursuant to that statutory requirement, the director of heath promulgated Ohio Adm.Code 3701-53. *Id*.

{¶55} The Ohio Supreme Court has held that rigid compliance with ODH regulations is not required, as such compliance is not always humanly or realistically possible. *State v. Plummer*, 22 Ohio St.3d 292, 294 (1986). Rather, if the prosecution shows substantial compliance with the regulations, absent prejudice to the defendant, alcohol and drug tests results are admissible. *Id.*, at 294-295.

{¶56} It has also been held that the burden to establish substantial compliance extends only to the level with which a defendant takes issue with the

legality of the testing at issue. *State v. Bordeau*, 2023-Ohio-2040, ¶ 13 (5th Dist.), citing *State v. Johnson*, 137 Ohio App.3d 847, 851 (12th Dist. 2000); *State v. Crothers*, 2004-Ohio-2299, ¶ 10 (12th Dist.).  "When the defendant's motion to suppress merely raises a generalized claim of inadmissibility and identifies the section(s) of the Administrative Code implicated in the claim, the burden on the State is slight." *Bordeau*, at ¶ 13, citing *State v. Bissaillon*, 2007-Ohio 2349, ¶ 12 (2d Dist.); *State v. Williams*, 1998 WL 214595 (2d Dist. Apr. 24, 1998); *State v. Embry*, 2004-Ohio-6324, ¶ 24 (12th Dist.).  "The State is only required to present general testimony there was substantial compliance with the requirements of the regulations; specific evidence is not required unless the defendant raises a specific issue in the motion to suppress." *Bordeau*, at ¶ 13, citing *Bissaillon*, *supra*, at ¶ 12; *State v. Crotty*, 2005-Ohio 2923, ¶ 19 (12th Dist.).

**{¶57}** Finally, as the Supreme Court of Ohio explained in *State v. Baker*, 2016-Ohio-451:

> A defendant must first challenge the validity of the alcohol test by way of a pretrial motion to suppress evidence; failure to file such a motion "waives the requirement on the state to lay a foundation for the admissibility of the test results." *State v. French*, 72 Ohio St.3d 446, 451, 1995 Ohio 32, 650 N.E.2d 887 (1995). The state then has the burden to show that it substantially complied with regulations prescribed by the director of health in the Ohio Administrative Code. If the state meets its burden of going forward with the evidence in this regard, a presumption of admissibility arises, and the burden then shifts back to the defendant to rebut the presumption by demonstrating prejudice from the state's failure to strictly comply with the applicable regulations in the Ohio Administrative Code.

*Id.*, at ¶ 23.

**{¶58}** In the instant case, Myers' motion to suppress the urine test results set forth twenty-one grounds for suppression, all of which generally reiterated the various Administrative Code provisions alleged to have been violated, but the motion did not set forth a case-specific factual basis for any of the twenty-one claims.

**{¶59}** On appeal, Myers argues – as he ultimately did in his written closing argument filed in the trial court with regard to the motion to suppress – that Ohio Adm.Code 3701-53-07 requires the laboratory to conduct a proficiency test for the type of testing performed, requires a written procedure manual for all testing performed, and requires that a urine test must be done in a laboratory by a laboratory technician. Myers asserts that the prosecution did not meet its burden in establishing substantial compliance with those regulations, primarily because no "documentary evidence" of the same was presented at the suppression hearing.

**{¶60}** Ohio Adm.Code 3701-53-07 sets forth certain requirements for laboratories conducting testing for alcohol or drugs of abuse in bodily substances. As relevant to the claims raised in this appeal, Adm.Code 3701-53-07 provides:

> (B) The laboratory shall successfully complete a national proficiency testing program using the applicable techniques or methods for which the laboratory personnel seek a permit under rule 3701-53-10 of the Administrative Code. The designated laboratory director or designee will submit a copy of the proficiency test results to the director or their designee.

(C) The laboratory will have a written procedure manual of all analytical techniques or methods used for testing of alcohol or drugs of abuse in bodily substances. Textbooks and package inserts or operator manuals from the manufacturer may be used to supplement but may not be used in lieu of the laboratory's own procedure manual for testing specimens.

* * *

(G) Tests for drugs of abuse in blood, urine, oral fluid and other bodily substances shall be performed in a laboratory by a laboratory director or by a laboratory technician. Laboratory personnel shall not perform a technique or method of analysis that is not listed on the laboratory director's permit.

{¶61} Contrary to Myers' claims, the record of the suppression hearing reflects that the State of Ohio presented evidence of substantial compliance with those regulations through the testimony of Jennifer Swatek, a forensic toxicologist employed by NMS Labs, the laboratory that tested Myers' urine sample for the presence of cannabinoid metabolite.

{¶62} In addition to the details set forth, *supra*, with regard to Swatek's testimony at the suppression hearing, her testimony served to establish the chain of custody and testing protocols that were followed with regard to the urine sample at issue. Specifically, Swatek testified that when a sample is received by that lab, the lab's specimen processing department logs the sample into the NMS system to start the chain of custody at NMS. Swatek testified that the specimen processor was also responsible for maintaining the integrity of the sample, providing the laboratory itself with samples necessary for testing, and arranging secured storage for any

sample not needed for testing. Swatek testified that, following that, the sample that was tested traveled through the lab in an assembly-line style, a process that included a specific laboratory technician preparing the sample for instrumental analysis, and then handling and processing the sample with quality controls and calibrations followed and validated as standard operating procedure.

{¶63} Swatek testified that after the sample went through instrumental analysis, an analyst then calculated the results using a set standard of acceptance criteria. Those results were then reviewed by a second analyst who assessed the results, and the results were then provided to Swatek, as the assigned toxicologist. Swatek then reviewed all of the quality control measures, the data, and performed an independent assessment of acceptance criteria to assure the accuracy and reliability of the results. Following that, a report with Swatek's signature was then issued. Swatek was also asked if NMS's protocols and procedures are set forth in a laboratory manual, and she testified that they are, and that NMS has standard operating procedures for essentially every process that is conducted within the lab. Swatek also testified that valid permits are in place from the Ohio Department of Health for the testing done by NMS Labs.

{¶64} In the absence of any case-specific factual claim having been raised in Myers' motion to suppress with regard to the qualifications of the laboratory personnel or the laboratory procedures in place at NMS, the prosecution met its burden of going forward with evidence that it had substantially complied with the

regulations prescribed by the director of health in the Ohio Administrative Code. Therefore, a presumption of admissibility arose, and the burden shifted back to the defendant to rebut the presumption by demonstrating prejudice from the state's failure to strictly comply with the applicable regulations in the Ohio Administrative Code. *State v. Baker*, *supra*, at ¶ 23. No such prejudice was demonstrated here.

{¶65} The third assignment of error is overruled.

*Conclusion*

{¶66} Having found no error prejudicial to the defendant-appellant, Andrew Myers, in the particulars assigned and argued, the judgment of conviction and sentence entered in the Allen County Court of Common Pleas is affirmed.

***Judgment affirmed***

**ZIMMERMAN, P.J., and MILLER, J., concur.**

# <u>JUDGMENT ENTRY</u>

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

Juergen A. Waldick, Judge

William R. Zimmerman, Judge

Mark C. Miller, Judge

DATED:
/jlm